Nash, C. J.
 

 The bill is filed to set aside a paper writing purporting to be a deed of gift from Susanah Barnett to the defendants. The grounds upon which relief is sought are two : The first, that the donor was from natural causes, incapable in law of making such a disposition of her property ; and secondly — if she had sufficient capacity, the deed was obtained from her by fraud.
 

 Susanah was deaf and dumb from her birth, and lived at the time of her death, and had done so for some time previous, with the defendant John Barnett.
 

 
 *222
 
 In the earlier history of the law, a person who was born deaf and dumb, was considered to be an idiot. That period has long passed, and the question as to their legal ability to make a contract is placed on its proper ground — their mental capacity. Modern inventions have restored these unfortunates to their proper stations in society. The domestic relation with all its endearments is open 10” them, and we find them occupying distinguished stations in almost every department of the arts and sciences. To the Abbe Sicard is justly due the distinguished honor of leading in the humane effort to enlighten and instruct this unfortunate class of human beings — and under his direction, their instruction assumed a systematic course. Buildings were erected, which have in time spread over Europe, and our own country is dotted with them. If we cast our eyes over the street, we see a noble structure erected at the public expense for this benevolent purpose. Able teachers employed, and among them those to whom nature has denied the usual inlets to knowledge.— There, may bo seen the deaf mute instructing his brother mute —throwing the light of science across his path, and leading him to the knowledge of the common Father of us all. The Bible is no longer a sealed book to the poor mute. Such are the blessings which have boon conferred upon this class of beings in modern times — and it is now an established principle, that the deaf mute’s capacity, is not to be measured by what he has not, but what ho has. Home controversy took place at the bar, as to the
 
 onus
 
 of proving capacity. It is not necessary for us in this case to decide the question; wo are satisfied by the testimony of the witnesses of the entire ca pacity of Busanah 'Barnett'to understand what she was doing.
 
 Dr. Jordan,
 
 who drew the paper and witnessed it, states “that the grade of understanding in both, (alluding to her brother Benjamin, who was also a deaf mute,) appeared to bo good, particularly in Busan. They were as intelligent as individuals could be, with their means of information.” The Dr. further states that ho lived within half a mile of John Barnett’s, where
 
 *223
 
 Susan lived, and was the family physician for twenty years; that he could converse with her upon ordinary subjects. — • "When any of the family were sick, she generally attended to them; but particularly when any of the children were; then, her attentions were most constant.
 
 “
 
 I believe,” (are his words,) “in every instance, I left the prescriptions with her— could learn from her the effects of the medicine. She generally noticed those effects, particularly on the children.” The high standing of
 
 Dr. Jordan,
 
 both as a physician, and as a man of intelligence, entitles his statements to full faith. In another part of his testimony, he is asked if Susan gave him any directions, when he took possession of the paper in controversy. His answer is — ’“that she directed mo after the first paper was executed to keep it until it was put on the big books at the Court House. Of
 
 this,
 
 however, I am not positively certain. I knew they were both in the habit of speaking of things that went on the record books of the county in this way.” But Dr. Jordan is not left alone upon this ques
 
 tion
 
 — John
 
 A. Barnett,
 
 whose character is proved to be as high as any man’s — states that after the death of John Barnett’s wife in 1836, Susan Barnett had the whole management of the domestic affairs of the family, up to 1850, all of which she attended to, as well as any house-keeper in the neighborhood, and she had the character of being one of the best managers in all the country. This testimony sufficiently establishes the mental capacity of Susan Barnett, the donor - though there is much other to the same effect.
 

 As to the alleged fraud, the plaintiffs have entirely failed to sustain their allegation.
 

 Dr. Jordan, who wrote the paper-writing, and witnessed it, states, that receiving a message that Busan Barnett wanted to see him, ho went to. John Barnett’s, where she lived ; he went into the room where she was, and told her what ho had come for, when she by signs directed a servant to bring pen, ink and paper, and a stand; and while this preparation was go
 
 *224
 
 ing on, he learned from
 
 'her
 
 how she wished to dispose of her property. “I wrote,” (says the witness,) “a nuncupative will, as I supposed. At her instance, I carried it away for safe keeping.” He then states, that in “ thinking over the transaction, it was impressed on his mind that she wanted a deed of gift, and that the paper he had drawn was no deed of gift. “I returned the ensuing morning, and stated to John Barnett what I came hack for. I immediately went into her room and told her the paper writing I had written the day before would not do, it must have her mark to it. I then sat down and wrote the one now before me — and explained it to her— she made her. mark, and I witnessed it. I never had any doubt of her intention to dispose of her property in the way it is disposed of in that paper.” In a subsequent examination, the Dr. stated that when he drew the present paper, he explained to her that the first would not do, she must make her mark, and that it made the same distribution of the property as the one written the day before. With respect to the disposition of the present paper, the witness stated that he kept it without any particular direction from the donor, but because she had directed him to keep the first, and have it put on the big. books at the Court House; and that when he placed it among his private papers, he endorsed upon its back,
 
 Deed of gift from Susan Bcvmett.
 

 John A. Barnett states that he believes she understood she was
 
 conveying
 
 her property to the persons therein named, and that she was well satisfied, and intended to convey the negroes in that way, by deed of gift. She got her slaves from her brother. He further stated that not being at home when the writing was drawn — meeting with Dr. Jordan, they went into the room where Susan Barnett was lying, and had the negroes all bi ought in, and she was requested to state how they were disposed of in the deed, which she did, assigning each negro as assigned in the deed.
 

 
 *225
 
 The deed upon its face, is an absolute conveyance,
 
 inpresentí,
 
 of (.he property; the plaintiffs, who allege that it was intended by her as a will, have produced no evidence to show that such was the fact. The first paper prepared by Dr. Jordan was of a testamentary character, and upon its being explained to her, the present paper was prepared, making the same disposition of her property as the proceeding one, and which was by the testimony of the witnesses precisely that which she had previously often expressed. As a will of slaves, this paper cannot operate — it has but one witness; and if we doubted as to the intention of the donor, as to whether it was to operate as a deed or will, upon the principle of
 
 res magis valeat quampereat,
 
 we should decide that it is what it purports to be, a deed of gift. The declarations of Dr. Jordan, that he would not have had the deed registered during the life of Susan Barnett, because he thought such was her intention, cannot alter the nature of the conveyance ; and his endorsement made at the time, shows what he considered was the character of the paper at that time, and what he declared to be his opinion when he drew the paper. The Dr. taking the paper with him under the circumstances, was a delivery by the donor. It was taken possession of with the donor’s knowledge, and may be considered as coming within the direction given by her to the witness the day before as to the other paper.
 

 Objection was made to the deposition of John A. Barnett, taken in behalf of the defendant. No reason was assigned, and we cannot perceive any. He may have had some interest in setting the paper writing aside, as a deed. lie certainly has none in supporting it as such, and so far as it went to show the capacity of Susan Barnett, and of her knowledge, of what she did when she executed the paper now in question, its competence is established by the case of Norwood v. Marrow, 4th Dev., and B. 441.
 

 
 *226
 
 The case is entirely destitute of any evidence to show un-dne influence, if it could have any hearing. There is no proof that the donor did not understand the difference between a deed and a will; but a sufficiency to show she intended the paper to operate as a present gift. Nor does the fact of her stripping herself of all her property, show she did not intend s© to do. She enquired of Mr, Barnett what was her mother’s age. When she found that she was about the age she then was, she at once proceeded to arrange her affairs, and no doubt intended to adopt the same mode by which she acquired her property — these very negroes. It is further objected that Dr Jordan received his information as to the names of the negroes given through a negro worn an, who was much better acquainted with the signs of her mistress^ than he was. We think this an unimportant objection, more particularly as the negroes were afterwards brought into her presence, and she designated each negro, and to whom given, which accorded exactly with the disposition of them in tire deed.
 

 Bill is dismissed with costs.